929 A.2d 113

**BALTIMORE CITY BOARD OF SCHOOL COMMISSIONERS**

v.

**CITY NEIGHBORS CHARTER SCHOOL, et al.**

**Board of Education of Prince George's County**

v.

**Lincoln Public Charter School, Inc.**

**Nos. 100, 121, Sept. Term, 2006.**

Court of Appeals of Maryland.

July 30, 2007.

Warren N. Weaver (Ilana Subar of Whiteford, Taylor & Preston, L.L.P., Tammy L. Turner, General Counsel, Baltimore City Board of School Commissioners, Baltimore, MD), on brief, for the Petitioner (No. 100).

F. William DuBois (DLA Piper U.S. L.L.P., Sedica Sawez of Rosenberg, Martin Funk & Greenberg, L.L.P., Paul A. Fenn and Anthony M. Conti of Conti, Fenn & Lawrence, L.L.C.), on brief, Baltimore, MD, Richard C. Daniels (Lani L. Daniels of Daniels & Green, L.L.C., College Park, MD), on brief, for Respondents (No. 100).

Andrew w. Nussbaum (Knight, Manzi, Nussbaum & LaPlaca, P.A., of Prince George's County, MD), on brief, for Petitioner (No. 121).

Richard C. Daniels (Lani L. Daniels of Daniels & Green, L.L.C., of College Park, MD), on brief, for Respondent (121).

Argued before BELL, C.J., and RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, WILNER, ALAN M. (Retired, Specially Assigned), JJ.

WILNER, J.

At issue in these two appeals are three declaratory rulings by the State Board of Education (SBE). Those rulings established standards for determining the amount of funding that the three public charter schools involved in the appeals are entitled to receive from their respective county boards of education. The Court of Special Appeals, by reversing contrary decisions of the Circuit Court for Baltimore City in one case (No. 100) and the Circuit Court for Prince George's County in the other (No. 121), affirmed the SBE rulings. We shall affirm the judgments of the Court of Special Appeals.

## BACKGROUND

### Charter Schools

Charter schools are in the nature of semi-autonomous public schools that operate under a contract with a State or local school board. The contract, or charter, defines how the school will be structured, staffed, managed, and funded, what programs will be offered, and how the school will operate and account for its activities. The movement to create charter schools, either by converting existing schools or by starting new ones, began in the 1990s from a growing concern that the public schools, at least in some areas, were not living up to legitimate public expectations, and the movement took root and spread quickly. By November, 2004, forty States and the District of Columbia had enacted charter school legislation, Congress had endorsed the movement and provided start-up

funding for charter schools,[1] and about 4,000 charter schools had been formed across the nation.

The principal objective of those who desired to create such schools—parents, educators, community groups, private entities—was to develop and implement innovative and more effective educational programs, and, to do that, they needed and demanded freedom from some of the structural, operational, fiscal, and pedagogical controls that governed the traditional public school system. That created obvious areas of conflict with various components of the existing public school system—school boards, administrators, teacher unions, and local fiscal authorities—which mostly and often vehemently opposed the effort, and it raised serious and complex questions regarding the organization, funding, accountability, and monitoring of these new schools.

These were questions that had deep public policy implications, questions that extended beyond the educational community, that soon resonated in the halls of Congress and State legislatures, and to which there seemed to be no universally accepted answers. There has yet to be any agreed-upon national model for either the schools themselves or a form of legislative authorization of them. The laws enacted by the various States vary considerably in a number of important respects, including the form and extent of public funding.

### The Maryland Law

After wrestling with the issue in five previous Sessions, the General Assembly created the Maryland Public Charter School Program in 2003, by enacting a new title 9 to the Education Article of the Maryland Code (ED). *See* 2003 Md. Laws, ch. 358. ED § 9–101(b) states as the purpose of the program to "establish an alternative means within the existing public school system in order to provide innovative learning opportunities and creative educational approaches to improve the education of students." Section 9–102 defines a public

---

1. *See* 20 U.S.C. §§ 7221 through 7221j.

charter school as a public school that meets the thirteen conditions and requirements set forth in that section. One of the requirements, § 9–102(11), is that the school operate in accordance with its charter. Section 9–103 makes the county boards of education the *primary* chartering authority and SBE, acting in an appellate capacity or as the public chartering authority for a restructured school, as the *secondary* chartering authority.

The chartering process is set forth in ED § 9–104. Section 9–104(a) lists the persons and entities authorized to apply for a charter and specifies that the application is to be filed with the appropriate county board of education. Subsection (a)(4)(i) directs the county board to review the application and render a decision on it within 120 days after receipt of the application. If the county board denies the application, the applicant may appeal to SBE in accordance with ED § 4–205(c).[2] If SBE reverses the county board's denial, it may order the county board to grant a charter, in which event SBE is directed to mediate with the county board and the applicant to implement the charter. ED. § 9–104(b)(3).

Section 9–105 requires the professional staff of a public charter school to hold the appropriate Maryland certification. Section 9–106 requires public charter schools to comply with the laws and regulations governing other public schools, but, with certain exceptions, permits SBE to waive those requirements. Section 9–108 provides that the employees of a public charter school are public school employees, that they are employees of the public school employer in the county where the charter school is located, and that they have the collective bargaining rights set forth in title 6, subtitles 4 and 5 of the Education Article. Section 9–110 requires the county boards to develop and submit to SBE public charter school policies that must include certain guidelines and procedures. Finally, § 9–109, which lies at the heart of these appeals, provides a

---

**2.** ED § 4–205(c)(3) provides a general right of appeal to SBE from decisions of county boards. Appeals must be in writing and taken within 30 days after the decision of the county board.

mandate for public funding of the public charter schools. Section 9–109(a) provides:

"A county board shall disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction."

### These Cases

As noted, two separate appeals are before us. They were not consolidated, but we have chosen to deal with both of them in this Opinion. No. 100, which emanates from Baltimore City, involves two public charter schools—City Neighbors Charter School and Patterson Park Public Charter School. No 121 comes from Prince George's County and involves Lincoln Public Charter School.

### City Neighbors

City Neighbors, a non-profit community group in northeast Baltimore City, applied to the Baltimore City Board of School Commissioners in March 2004 to open a public charter school in September, 2005. For purposes of the public charter school law, the Baltimore City Board of School Commissioners constitutes a county board of education; for convenience, however, we shall refer to it as the city board. The application anticipated public funding from the city board at the rate of $7,500 per pupil. When the city board failed to act upon the application within 120 days, as required by ED § 9–104(a)(4)(i), City Neighbors filed an appeal to SBE. The city board moved to dismiss the appeal on the ground that, because it had deliberately made no decision, there was nothing to appeal. SBE rejected that argument, found the city board to be non-compliant with § 9–104(a)(4), and directed that it act upon the application by November 9, 2004.[3]

---

**3.** SBE also found that the city board's decision to grant no more than three applications the first year was unauthorized and void.

On November 9, the city board conditionally approved the application, contingent upon a subsequent agreement as to a charter. The conditional approval made no commitment of any public funds that would be required under ED § 9–109. Discussions continued between City Neighbors and officials of the city board, without success. The city board insisted on excluding certain categories of its system-wide spending when calculating the charter school allocation and on requiring the charter schools to accept other categories of expense in the form of services rather than cash, both of which were unacceptable to City Neighbors. Perceiving that the dispute centered on a disagreement over what was required under ED § 9–109(a), City Neighbors, on February 28, 2005, filed a petition with SBE for a declaratory ruling on the proper interpretation and application of that provision. The petition was filed pursuant to COMAR 13A.01.05.02D, a SBE regulation that permits any party to "file a petition for declaratory ruling by the State Board on the interpretation of a public school law or regulation of the State Board that is material to an existing case or controversy." *See* also Maryland Code, §§ 10–304 and 10–305 of the State Government Article, which expressly authorize administrative agencies to issue declaratory rulings. The petition complained that the dispute over funding had delayed negotiations toward a charter agreement and that, without a determination of the method and amount of funding, new public charter schools such as City Neighbors were unable to make plans for a Fall 2005 opening.

The city board moved to dismiss the petition, raising a number of defenses, including mootness. It attached to its motion a "funding model" for public charter schools that it had developed and circulated to charter school applicants on March 8, 2005. Under that funding model, the city board advised that the per pupil funding for FY 2006 would consist of $5,011 in cash and $2,943 in services, some of which City Neighbors did not seek, did not need, and did not desire. In calculating the per pupil allocation, the city board excluded Federal entitlement funds, system administrative costs, funds for special education, transportation expenses, expenses for

health services, expenses for utility services, and the cost of food services.

### Patterson Park

Patterson Park Public Charter School. Inc. is a non-profit Maryland corporation. On August 31, 2004, it filed an application with the city board to establish a public charter school in the southeastern part of the city. The application sought initial year funding at the per pupil rate of $7,500. On November 17, 2004, the city board conditionally approved the application, contingent on a satisfactory facility inspection, final submission of a school budget, and successful contract negotiations. As with City Neighbors, no funding commitment was made and no charter was issued. Discussions ensued between Patterson Park and city board officials, but, by the end of January, 2005, which was more than the 120 days allowed for approval or rejection, the city board had failed to identify or remove any specific conditions on approval of the application, which Patterson Park took to constitute a denial. On January 24, 2005, it noted an appeal to SBE. In its notice, Patterson Park averred that the city board had indicated that per pupil funding would be at the approximate rate of $4,200, all of which would come in the form of services. Patterson Park contended that it required a cash disbursement of $7,500 per pupil plus Federal entitlement and special education funds.

As it had done with City Neighbors' petition, the city board moved to dismiss Patterson Park's appeal, claiming that the application had been granted and SBE was without jurisdiction. That motion was filed before the city board released its March 8, 2005 funding model.

### Lincoln

On September 10, 2004, Lincoln Public Charter School, Inc., a non-profit Maryland corporation, filed an application with the Prince George's County school board to establish a two-campus public charter school in Prince George's County. Lincoln requested funding from the county board that is "roughly

equivalent to that spent per child" by the county board, which Lincoln calculated as $8,544. On January 7, 2005, the county board invited Lincoln to meet with the board's staff to review aspects of the application "that are of concern to the school system," to negotiate mutually acceptable terms, and, "contingent on reaching agreement on issues for negotiation and/or modification," to execute appropriate contract documents.

Negotiations commenced pursuant to that invitation, but they were unsuccessful. On January 24, 2005—following the expiration of the 120–day period allowed for approval or rejection of the application—the chief negotiator for the county board advised Lincoln that there remained three "potential obstacles" to reaching agreement, one related to funding, the second to whether Lincoln could obtain a waiver of the requirement that its employees be public school employees, and the third an insistence by the county board that all assets purchased by Lincoln with public funds must be and remain the property of the county board, including lease improvements and textbooks. The letter set forth the county board's position on those items and advised that Lincoln's acceptance of the board's positions "is essential for negotiations to continue." With respect to funding, the county board proposed to pay $5,495 per pupil, whereas Lincoln claimed a need for $8,554. Regarding the board's letter as a denial of its application, Lincoln noted an appeal to SBE. The county board moved to dismiss the appeal on the ground that it had, in fact, granted Lincoln's application, albeit conditionally.

### SBE Proceedings and Rulings

SBE had before it three separate matters—a petition for declaratory ruling by City Neighbors, an appeal by Patterson Park, and an appeal by Lincoln. It was aware that there were several other public charter schools with applications pending before county boards. Recognizing that the appeals by Patterson Park and Lincoln, like the petition filed by City Neighbors, centered on the proper construction of ED § 9–109(a), a public school law that was material to an existing case or controversy, SBE treated the two appeals as petitions for

declaratory ruling. Although it kept the three petitions separate and issued separate rulings in the three cases, it consolidated the cases for purposes of oral argument, which was held on April 19, 2005.

On May 6, 2005, SBE issued its initial opinions in the three cases (Opinion No. 05–17 in City Neighbors, Opinion No. 05–18 in Lincoln, and Opinion No. 05–19 in Patterson Park). The three opinions were similar in their structure and in their conclusions, and they essentially rejected the city and county boards' construction of ED § 9–109. Unlike City Neighbors and Patterson Park, Lincoln, in addition to the complaint about funding, sought a waiver of the requirement that its employees, other than full-time classroom teachers, be school system employees.

The three opinions obviously attracted considerable comment, some of it critical, in the news media and among the educational establishment, and, in response, SBE requested the State Superintendent of Schools, two other State Department of Education officials, and its own counsel to address the Board at its regular open meeting on May 24. As a result of those presentations, SBE issued revised opinions in each of the three cases on May 26, 2005. Those opinions, which were both clarifying and substantive in nature, constitute the final decisions of the Board.

Each of the revised opinions addressed three basic subjects—the standard of review to be applied by SBE, the application process, and the proper interpretation of ED § 9–109(a). The opinion dealing with Lincoln also addressed the waiver issue. With respect to standard of review, the Board noted that, under ED § 2–205(e), it was empowered to "explain the true intent and meaning" of the provisions of the Education Article that were under its jurisdiction and to decide "all controversies and disputes under these provisions" and that COMAR 13A.01.05.05E directed that the Board "exercise its independent judgment on the record before it in the explanation and interpretation of the public school laws and State Board regulations."

SBE concluded that the application process involved two steps. The first step consists of the development, submission, and review of the application, which is to allow the county board to examine all aspects of the proposal. The second step commences after the application is approved and involves completion of an actual charter agreement. The thoroughness of the first step, the Board concluded, should pave the way for incorporation of the approved application into the charter agreement "with the need for minimal additional negotiation in completing" the second step. Mindful of the 120–day statutory deadline for a county board decision on an application, SBE concluded that the second step should be completed within 30 days after approval of the application.

The main issue was funding and the meaning of ED § 9–109(a), in particular the phrase "commensurate with the amount disbursed to other public schools in the local jurisdiction." The Board concluded that the phrase expressed a legislative intent that a public charter school "receive federal, State, and local funding in an amount proportionate to the amount of funds expended for elementary, middle, and secondary level students in the other public schools in the same system." That includes, the Board added, "funding for services for which students in the public charter schools are eligible such as free and reduced price meals, pre-kindergarten, special education, English language learners, Perkins, Title I, and transportation." [4]

Noting that there existed no statewide formula or methodology for determining how local school systems fund their schools, the Board concluded that a reasonable starting point for determining the commensurate amount was "the total annual school system operating budget that includes all federal, State, and local funding with the approved appropriations for each of the major categories specified in § 5–101(b)(2) of

---

**4.** Title I refers to Title I of the Federal Elementary and Secondary Education Act of 1965, as amended from time to time. *See* 20 U.S.C. §§ 6301–6600. Perkins refers to the Federal Carl D. Perkins Vocational Education Act. *See* 20 U.S.C. §§ 2301–2471.

the Education Article that each local board of education submits to [the State Department of Education] within 30 days of approval by the respective local governments."[5] The next step is to divide the total annual operating budget and each of the major category appropriations by the annual September 30 enrollment count of the school system for the previous year, to calculate the average per pupil funding overall and per major category.

Recognizing that there were certain support functions, such as data collection and the development of public charter school policies, that could be performed only by the central office of the local school system, SBE directed that the total average per pupil amount be reduced by 2% as a reasonable cost of performing those functions. The adjusted total average per pupil amount is then to be multiplied by the student enroll-ment of the charter school to determine the total funding amount for the charter school.

Because the total school system operating budget encom-passed all funds, including Title I and special education funds, the Board determined that the average per pupil amount derived from that figure would be sufficient for the charter school to deliver the services for which its students were eligible. The school would have to make budgetary allocations in light of the students' eligibility requirements, however, and must comply with applicable Federal and State requirements. For the special services that must be provided to eligible students, the charter school could elect either to provide the

---

**5.** ED § 5–101(b) specifies the categories that must be included in the county boards' annual school budget, one of which is requested appro-priations for current expense fund. Section 5–101(b)(2) specifies the subcategories that must be included in that category: (i) Administra-tion; (ii) Mid-level administration; (iii) Instructional salaries; (iv) Text-books and classroom instructional materials; (v) Other instructional costs; (vi) Special education; (vii) Student personnel services; (viii) Health services; (ix) Student transportation; (x) Operation of plant and equipment; (xi) Maintenance of plant; (xii) Fixed charges; (xiii) Food services; and (xiv) Capital outlay. The Board determined, however, that, for purposes of charter school funding, appropriations for debt service and adult education were to be excluded.

services directly or have them provided by the school system, but if it opted for the latter, it would be required to reimburse the school system for the proportionate cost of those services. Reimbursement would also be required "for salary, local retirement, and other fringe benefit costs for the public school employees working in the charter school as well as for regular services and supplies that the charter school requests the local school system to provide."

As "further guidance" on the implementation of that funding methodology, SBE adopted and incorporated by reference "guidance documents" that had been prepared, at the Board's request, by State Department of Education officials and that had been discussed at the Board's open meeting on May 24. With respect to City Neighbors and Patterson Park, SBE concluded that the total per pupil spending by the city board for the various categories it believed must be included to arrive at commensurate funding was $10,956. In Lincoln's case, the Board determined that the total per pupil spending by the county board was $9,664.

The Board recognized the prospect that not every student attending a charter school would be entitled to Title I or special education funds or services and, indeed, that in some charter schools none of the students might be eligible, that funding restrictions applicable to those programs would require the public charter schools to adjust their budgets "to be in compliance with programmatic laws and regulations," that the calculation of average cost "does not mean that the funding mix of each fund source to the [county board] must be duplicated at the Charter School level," and that "average is just that, it does not necessarily represent an amount that any specific pupil gets."

As Exhibit 3 to its opinions, SBE adopted a formula for the separate calculation of Title I funding for the charter schools and provided for a reduction in the total per pupil allocation for per pupil Title I funding if the charter school is not to receive that funding. As Exhibit 4, the Board adopted a Technical Assistance Bulletin prepared by the Department

with respect to Charter Schools and Special Education. No amounts were calculated with respect to those items.

SBE declined to make a definitive ruling with respect to Lincoln's waiver request. It noted that, under ED § 9–108, public charter school employees are public school employees of the public school employer in the county where the charter school is located and that they have the collective bargaining rights granted to other public school employees in title 6, subtitles 4 and 5 of the Education Article. The Board observed as well that the statute allows the charter school and the unions to negotiate amendments to existing collective bargaining agreements to address the needs of the particular charter school. It suggested that Lincoln attempt to negotiate with the unions, or "pursue the procedures set forth in the State Board's proposed regulations on waivers for charter schools, or a combination of both." [6]

Finally, perhaps in light of the facts that it was already dealing with three charter schools, that there were several others in the pipeline, and that it was issuing a declaratory ruling, the Board noted that its opinions should be used as "guidance and direction" to the other charter school applicants and local school systems "for the refinement of their working relationships on behalf of the public school children throughout this State."

---

6.    SBE had an existing regulation, COMAR 13A.01.01.02–1, that permitted it, upon a demonstration of good cause, substantial compliance, or comparable effort, to grant waivers *from its regulations.* A waiver could not exceed three years but could be renewed for additional three-year periods. A waiver was limited to compliance with SBE regulations; there was no provision for SBE to waive compliance with any statute. The Board noted that it had published proposed regulations with respect to waivers for charter schools in the April 29, 2005 issue of the Maryland Register. *See* 32–9 Md. Reg. 874. The proposed regulation provided a procedure for seeking a waiver but otherwise tended to follow the provisions of ED § 9–106. A hearing on the proposed regulation was held by the Legislative Joint Committee on Administrative, Executive and Legislative Review on June 29, 2005. On July 11, 2005, the regulation was resubmitted as an emergency regulation, but on July 20, 2005, it was withdrawn. As of the date these appeals were argued before is, it does not appear that any regulation pertaining specifically to waivers for public charter schools has yet been adopted.

### *Judicial Review*

### *City Neighbors and Patterson Park*

The city board petitioned for judicial review in the Circuit Court for Baltimore City in both the City Neighbors and Patterson Park cases. Although not parties to the SBE proceeding, the Baltimore Teachers Union and the Baltimore City Municipal Employees Union also petitioned for judicial review, and several other public charter schools filed responses to the city board's petition. The court consolidated all of the petitions. The city board complained that SBE had misconstrued ED § 9–109, that its funding formula violated Federal law, that its declaratory rulings constituted impermissible rulemaking, and that various procedural deficiencies violated its right to due process.

The unions complained that SBE erred in determining that public charter schools could request waivers of employee rights protected by ED § 9–108. That issue was not, in fact, in the City Neighbors and Patterson Park cases then under judicial review. Patterson Park, along with several other public charter schools, had requested a waiver in a separate proceeding. *See Patterson Park v. Teachers Union,* 399 Md. 174, 923 A.2d 60 (2007).

On July 12, 2005, while the judicial review action was pending, the city board granted City Neighbors a three-year charter. The parties reached agreement as to funding only for the first year (2005–06), however, leaving open and unresolved the level of funding for school years 2006–07 and 2007–08. On August 2, 2005, a similar agreement was reached with Patterson Park—the city board granted a three-year charter but agreed to funding for only the first year. Those agreements permitted the two schools to open as scheduled in September, 2005.

On August 24, the court filed a memorandum opinion and order in which it (1) dismissed the city board's petition as moot in light of the partial agreements reached with City Neighbors and Patterson Park, (2) nonetheless opined that the procedure used by SBE was "flawed," and (3) notwithstanding

that the issue of waiver presented by the unions was not at issue in the SBE proceedings under judicial review in that court, nonetheless declared that SBE erred in determining that public charter schools could request waivers of the statutory requirement that their employees must be full-time public employees. The attached order dismissed the city board's petition as moot and reversed the SBE declaratory ruling governing the seeking of waivers. Both City Neighbors and Patterson Park filed a motion to alter or amend the judgment, arguing that the case was not moot. When their motions were summarily denied, without a hearing, they and the city board appealed.

The Court of Special Appeals found each of the Circuit Court's rulings to be erroneous and therefore reversed its judgment. *City Neighbors v. School Board,* 169 Md.App. 609, 906 A.2d 388 (2006). The court held that the issue regarding the funding of the City Neighbors and Patterson Park schools was not moot, that SBE's declaratory rulings were not erroneous, either procedurally or substantively, and that the unions' complaint about waiver was not ripe for review.

### *Lincoln*

The Prince George's County Board of Education was no more enamored with the SBE declaratory ruling in *Lincoln* than the city board was with the rulings in *City Neighbors* and Patterson Park. It filed a petition for judicial review in the Circuit Court for Prince George's County. That court found that the county board had, in fact, accepted Lincoln's application, that SBE erred in failing to address the county board's motion to dismiss, which the court seemed to believe had merit, and that the Board erred as well in converting Lincoln's appeal to a petition for declaratory ruling. Substantively, the court found that SBE acted arbitrarily and capriciously in its determination of commensurate funding—that it should have deferred to the county board's view, that it was substantively wrong in its interpretation, and that it had engaged in impermissible rulemaking. On those bases, it reversed the SBE ruling.

In Lincoln's appeal, the Court of Special Appeals, in an unreported opinion, reversed the Circuit Court's judgment. Following a long line of decisions of this Court that the Circuit Court largely ignored, the appellate court noted the broad statutory authority of SBE to explain the true intent and meaning of the public education laws and the requirement that courts give substantial deference to SBE's construction of those laws. The Court of Special Appeals likewise found no procedural deficiencies and concluded that the State Board "acted within the bounds of its authority both in reviewing the de facto denial of [Lincoln's] application and in ordering the County Board to approve the application."

## DISCUSSION

We granted *certiorari* in both cases and, as noted, shall affirm the judgments of the Court of Special Appeals. We shall deal first with the procedural or penumbral issues raised by the school boards and then address the major issue— SBE's construction of ED § 9–109.

### Standard of Review

In actions for judicial review of SBE rulings and decisions, there may be two aspects to the issue of standard of review, although, because they are governed by the same principles, they often coalesce. There is ultimately the question of what standard the court is to apply in reviewing the SBE decision, but subsumed in that may be the question of what standard should be applied by SBE when, in an appellate capacity, it reviews the decision of a county board of education. Both aspects are raised in these cases.

Summarizing and confirming earlier decisions of this Court, dating back to *Wiley v. School Comm'rs*, 51 Md. 401 (1879), we observed in *Board of Educ. of P.G. Co. v. Waeldner*, 298 Md. 354, 359–62, 470 A.2d 332, 335 (1984) that SBE "has very broad statutory authority over the administration of the public school system in this State," that the totality of its statutory authority constitutes "a visitatorial power of such comprehensive character as to invest the State Board 'with the last word

on any matter concerning educational policy or the administration of the system of public education,' "[7] that this power is " 'one of general control and supervision,' " that it "authorizes the State Board to superintend the activities of the local boards of education to keep them within the legitimate sphere of their operations," and that " 'whenever a controversy or dispute arises involving the educational policy or proper administration of the public school system of the State, the State Board's visitatorial power authorizes it to correct all abuses of authority and to nullify all irregular proceedings.' "[8]

Although, as we pointed out in *Halsey v. Board of Education*, 273 Md. 566, 572, 331 A.2d 306, 309 (1975), that visitatorial power is not unlimited, and it is the courts that ultimately must decide purely legal questions, the broad statutory mandate given to SBE requires that special deference be given to its interpretation of statutes that it administers. In that regard, we observed in *Bd. of Ed. for Dorchester Co. v. Hubbard*, 305 Md. 774, 790–91, 506 A.2d 625, 633 (1986), that "[w]hile administrative agencies generally may interpret statutes, as well as rule upon other legal issues, and while an agency's interpretation of a statute which it administers is entitled to weight, the paramount role of the State Board of Education in interpreting the public education law sets it apart from most administrative agencies." *See also Arroyo v. Board of Education*, 381 Md. 646, 663–64, 851 A.2d 576, 587 (2004); *Board of Education v. Heister*, 392 Md. 140, 896 A.2d 342 (2006). What that statement means is that SBE rulings must be given heightened, not less, deference.

This unbroken and consistent line of cases supports the precepts embodied in COMAR 13A.01.05.05.—that (1) decisions of a local board involving a *local* policy or a dispute regarding rules or regulations of the *local board* shall be

**7.** Quoting from *Resetar v. State Board of Education*, 284 Md. 537, 556, 399 A.2d 225, 235 (1979), *cert. denied*, 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979).

**8.** Quoting in part from *Zeitschel v. Board of Education*, 274 Md. 69, 81, 332 A.2d 906, 912 (1975).

considered by SBE as *prima* facie correct, and SBE will not substitute its judgment for that of the local board in such cases unless the local decision is arbitrary, unreasonable, or illegal, but (2) SBE shall exercise its independent judgment on the record before it in the explanation and interpretation of the State public school laws and State Board regulations. A local board decision will be regarded as arbitrary or unreasonable if "[i]t is contrary to sound educational policy" and it will be regarded as illegal if it "[m]isconstrues the law" or is "an abuse of discretionary powers." COMAR 13A.01.05.05.B.(1) and C.(3) and (5).

■ In these cases, SBE was construing a State statute, not a local board policy or regulation. It therefore owed little deference to the city and county board decisions, but was required to exercise its own independent judgment as to the proper interpretation of ED § 9–109, and, under our long-established jurisprudence, the courts are required to give substantial deference to the SBE interpretation, especially as that interpretation, though ultimately a legal conclusion, is laced with substantial educational policy. We give no more deference to the city and county boards' decision than SBE was required to give. It is the SBE decision that we review.

### Rulemaking

■ Keying in part on the comment in each of the three SBE opinions that the opinions should provide "guidance and direction" to other charter applicants and local school systems, the city and county boards in these cases urge that the SBE rulings constitute a "regulation" as defined in Maryland Code, § 10–101(g) of the State Government Article, that it was not adopted in conformance with the requirements of the Administrative Procedure Act, and that it is therefore void. They are wrong, as are our colleagues in dissent.

The State Administrative Procedure Act, codified in title 10 of the State Government Article (SG), contains three major segments. Subtitle 1 deals with rulemaking—the adoption of regulations. Subtitle 2 deals with contested cases; and subti-

tle 3 deals with declaratory rulings. SG § 10–304 permits an interested person to submit to a State agency a petition "for a declaratory ruling with respect to the manner in which the [agency] would apply . . . a statute that the [agency] enforces to a person or property on the facts set forth in the petition." Section 10–305 authorizes the agency to issue such a declaratory ruling, which binds the agency and the petitioner on the facts set forth in the petition.

The law very clearly recognizes a declaratory ruling under § 10–305 as something different from a regulation. SG § 10–101(g) defines "regulation," and, although the definition is a broad and encompassing one, § 10–101(g)(2)(iii) expressly excludes from the definition "a declaratory ruling of the [agency] as to a . . . statute, under Subtitle 3 of this title." As we observed, the authority of SBE to issue declaratory rulings is set forth as well in a duly adopted SBE regulation. COMAR 13A.01.05.02.D, which is part of the regulation governing appeals to SBE, allows a party to file a petition for a declaratory ruling on the interpretation of a public school law that is material to an existing case or controversy and provides that the procedures in that regulation relating to appeals applies to SBE's review of a petition for declaratory ruling. That confirms that declaratory rulings are treated more in the nature of contested case adjudications than the adoption of a regulation. They are designed to resolve existing specific controversies that emanate from a dispute over the meaning of a State public school law or SBE regulation.

We have recognized that administrative agencies have discretion to establish policy either through the adoption of regulations or through *ad hoc* contested case adjudications and that it would b e "patently unreasonable" to conclude that "every time an agency explains the standards through which it applies a statute in a contested proceeding it is promulgating rules." *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 167–68, 501 A.2d 1307, 1318–19 (1986). *See also MD HMO's v. Cost Review,* 356 Md. 581, 600, 741 A.2d 483, 493 (1999); *Consumer Protection v. Consumer Pub.,* 304 Md. 731,

753–55, 501 A.2d 48, 60–61 (1985). Declaratory rulings are thus a permissible mechanism by which SBE may exercise its statutory authority to "explain the true intent and meaning" of the public school laws and decide "controversies and disputes" under those laws.

The rulings at issue here were specific to three individual cases that happened to involve some common issues relating to the construction of ED § 9–109. That statute, like the charter school movement generally, was a new one, not at all free from ambiguity, and SBE was well within its discretion to proceed in the manner it did—adjudicating the cases before it and offering "guidance" to other applicants, rather than proceeding with more formal and binding regulations.

### Commensurate Funding

The principal question in these appeals is whether SBE properly construed and applied ED § 9–109(a). As noted, that section, enacted in 2003 as part of the comprehensive law governing public charter schools, requires a county board of education to "disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction."

The city and county boards commence their attack on the SBE's rulings by noting that the General Assembly declined to provide, itself, a specific funding formula for public charter schools but instead adopted the "commensurate" standard. With a supposed logic that escapes us, they then seem to complain that, because the Legislature failed to provide such a specific and detailed formula, SBE had no right to create one. They urge that the determination of what funding is commensurate with the amounts disbursed to the other public schools must, as a matter of law, be left mainly in the hands of the local boards, by methodologies of their choosing—that it is a local matter. Such a conclusion, of course, raises the specter of 24 disparate methods of implementing a uniform State law and would denigrate SBE's long-established authority to ex-

plain the true intent and meaning of the public education laws that it is charged with enforcing.

From that premise, they attack first SBE's use of per pupil expenditures as a measure of commensurate funding, arguing that "[h]ad the General Assembly intended that funding be based on 'per pupil expenditures,' it would have said so." They then urge that SBE was required by law to exclude from its calculation of per pupil expenditures huge categories of expenses—transportation expenses, all grant funded instructional costs, all maintenance expenses, and all administrative expenses. Finally, they dispute SBE's determination that the entire funding must be in money, rather than partly, or, theoretically, wholly, in services.

We start with the clear fact that the statute is patently ambiguous. All parties agree, and necessarily so, that the county school boards do not disburse funds to the other public schools in the local jurisdiction. The school boards do not send checks, wire funds, or deliver wads of cash to the principals for the payment of teachers' salaries or the salaries of anyone else, or for the purchase of textbooks, other instructional materials, or incidental supplies and equipment, or for the maintenance of their respective facilities, or to provide transportation, lunch, or health or guidance services for the students. The phrase "disbursed to other public schools in the local jurisdiction" therefore cannot be read literally. No one can calculate a precise dollar amount disbursed to the X Middle School in order to determine a "commensurate" amount that should be disbursed to the Y Public Charter Middle School, because there is no such disbursement. The whole comparative framework, therefore—what the disbursement to the public charter schools should be commensurate with—requires interpretation. It is not even close to being clear on its face.

In light of such an ambiguity, two precepts, fortunately converging ones, come into play. The first is the heavy deference that must be accorded to SBE interpretations of the public school laws, especially interpretations that go beyond

purely legal determinations and affect or implement signifi-
cant educational policy. So long as the SBE interpretation is
not patently wrong, we would ordinarily defer to it. *See ante.*
To the extent that we desire to look further, we would apply
the most relevant rules of statutory construction to determine
the legislative intent, and, in that regard, may consider legisla-
tive history and the statutory purpose. *See Twine v. State,*
395 Md. 539, 550, 910 A.2d 1132, 1138 (2006). In this case,
legislative history is especially pertinent. ED § 9–109 did not
spring live and instantaneously from the head of Zeus in 2003
.but was the product of six years of deliberation and obvious
compromise.

In September, 1996, SBE, reacting to what was going on
around the country and at the Federal level, created a Public
Charter School Study Group to assist the Board in developing
a policy position regarding public charter schools. In its
January, 1997 Report to SBE, the Study Group, citing a
February, 1996 report to the Education Commission of the
States, observed that the key issues of concern regarding
public charter schools seemed to be:

"(1) inadequate capital funding and facilities; (2) cash flow
problems and the difficulty in securing credit; (3) a large
number of laws and regulations (and paperwork reporting)
which continue to be required of charter schools; (4) strug-
gles in obtaining local school board sponsorship; (5) difficul-
ties managing the business of the schools; and (6) inade-
quate planning."

*See Report of the Public Charter School Study Group to the
Maryland State Board of Education,* January 28,1997, at 3
[hereafter Report], citing *Charter Schools: Initial Findings,*
Louann A. Bierlein, Louisiana Educational Policy Research
Center, Louisiana State University, p. 8.

Although the Study Group concluded that the local school
boards already had the authority to establish charter schools
and that legislation was not necessary for that purpose, it
recognized that the local boards had little guidance on the
issues to be considered in granting a charter and that State-

wide legislation was likely, and it therefore offered a number of recommendations, among which were:

(1) Charter schools should "utilize unique approaches to teaching and learning to create conditions that encourage education reform." *Report,* at 4.

(2) Charter schools "should be non-profit, non-religious, non-sectarian, and not based in private homes." *Id.* at 4. Tuition must not be charged. *Id.* at 7.

(3) Charter schools "would have the legal status of the other public schools within the jurisdiction and could, as any public school, request waiver of local rules, State regulations, and State and federal statutes other than those relating to health, safety, civil rights, and disabilities." *Id.* at 5. In that regard, the Study Group noted that local school boards had a procedure to waive their own rules, that they could request SBE to waive State regulations "deemed unnecessary for the operation, enhancement of academic achievement, and student performance of any local public school," and that SBE had been delegated the authority by the U.S. Department of Education to waive certain federal requirements "that might inhibit the flexible operation and management of a school." *Id.* at 5. The Study Group expressed the caveat, however, that, notwithstanding any waiver, educational achievement should continue to be measured by the same standards used by SBE to assess achievement in the public schools.

(4) Charter schools "should be eligible for local, State, and federal funds as calculated for 'like-kind' of students and services in other public schools (i.e., disabilities, gifted and talented, reasonable transportation, etc.)" and that "[l]ocal school systems should expect State funding for local charter schools to be commensurate with State funding for the system's public schools." *Report* at 6.

(5) All teachers in the charter school should be employees of the school system, "with all of the rights, responsibilities, and benefits granted to the teachers by law, including the right to join the local union for collective bargaining purposes." *Id.* at 7.

(6) Appeals of controversies relating to a charter school should continue to go to SBE, but the standard of review should be "somewhere between 'arbitrary, capricious, or illegal' and *de novo.*'" *Id.* at 8.

Based on those recommendations, the State Department of Education, in July, 1997, adopted Guidelines for local boards to use when considering charter school applications. With respect to funding, the departmental Guideline noted:

"It is expected that Maryland public charter schools authorized by local education authorities will receive a fair per pupil foundation grant that is at least equal to the calculated operating costs for educating the like kind of students in existing public schools within that jurisdiction. The per-pupil calculation should include eligible local, state, and federal funds in the calculations. Other fiscal support such as transportation may be part of the negotiations between the charter requestor and the local education authority."

*Guidelines for Use by Local School Systems in Considering Charter School Applications,* Maryland State Department of Education, July, 1997, at 8.

Legislation to govern the creation and operation of charter schools and to codify some of the recommendations of the Study Group was introduced into the 1998 Session of the General Assembly as HB 999. As does the current law, HB 999, through a new title 9 to the Education Article, would have provided for and set conditions on the granting of charters and the operation of public charter schools, prohibited a charter school from charging tuition, and provided instead for public funding. Proposed ED § 9–103(b) provided that public charter schools were to be managed by their respective boards of trustees and operated "independently of the county board[s]." ED § 9–113 required the county board to "pay directly to the public charter school, for each student enrolled in [the school] who resides in the county, an amount not less than 90% nor more than 100% of the per pupil operating costs for educating the same kind of student in the existing public schools of the county" and made the charter school "eligible

for county, State, and Federal funds in the same manner as calculated for like-kind students of regular public schools in the county.".

The bill was opposed, in whole or in part, by the local school boards, the county school superintendents, and the two major teachers' unions (which maintained their opposition year after year). All of its provisions were stripped, and it was completely revamped to do nothing more than create a Task Force to study the matter and recommend legislation for the 1999 Session. As so amended, it was enacted as 1998 Md. Laws, ch. 720.

A second try was made in 1999, in the form of HB 116 and SB 761, which took different approaches. As introduced, HB 116 would have required the county board to pay directly to the school, for each enrolled student, "an amount that is the equivalent of the amount that the county board pays for the education of the same kind of student at a public school in the county as determined by [the State Department of Education]." That provision was deleted in the House Ways and Means Committee and replaced with one directing that "each student enrolled in a charter school shall receive the per pupil basic current expense figure calculated under § 5–202 of this Article" and that the school and the county board could negotiate for additional funding. The substituted provision would have tied the funding mandate to a specific statutory formula.[9]

The Senate Economic and Environmental Affairs Committee objected to that amendment and restored the original provision, which was consistent with the approach taken in SB 761 and required payment, for each enrolled student, of the amount the county board pays for "the same kind of student" at a public school, adding that "this amount includes the State

---

9.  ED § 5–202 sets forth the formula for *State* financial assistance to the public schools. At the time, § 5–202(a)(3) defined the term "basic current expenses" as including certain enumerated "Statewide aggregate expenditures from the current expense fund" less certain other expenditures.

share of basic current expenses." The differences were significant. According to the Fiscal Note prepared by the Department of Legislative Services, the House version would have produced a per pupil payment of $3,901, whereas the Senate version would have required a per pupil payment of $6,688. Neither bill passed.

Bills were introduced into both Houses in the 2000 Session—SB 543 and HB 526. This time, the two were together with respect to the funding provision, set at the lower level. They each would have required that the county board pay "directly" to a public charter school, for each enrolled student, an amount "that is equivalent of the amount that the county board would pay for the education of the student at a traditional public school in the county as determined by the [State Department of Education]," which amount would include the State share of basic current expenses. The Department of Legislative Services, in its Fiscal Note, construed that provision as requiring payment of the basic current expense of $4,005, which was $3,518 less than the estimated average per pupil operating expenditures for public schools. The House Ways and Means Committee struck that provision and substituted the language it had used in 1999, requiring payment of the per pupil basic current expense figure calculated under ED § 5–202, with the ability to negotiate for more, but, according to the Revised Fiscal Note, the fiscal effect was the same—$3,518 per pupil less than the estimated average per pupil operating expenditures in the public schools. Again, neither bill passed.

The same fate awaited three bills in 2001. House Bill 29 used the language previously insisted upon by the Ways and Means Committee—requiring payment of the per pupil basic current expense calculated under ED § 5–202 with the ability to negotiate for more. That approach would have produced $4,126 per pupil, or $3,700 per pupil less than the estimated 2002 average per pupil operating expenditures in the public schools. Senate Bill 721, using the language favored by the Senate, would have required the same level of funding provided to traditional public schools, which would have produced a

payment of approximately $7,700 per pupil. Senate Bill 604 was a shorter bill that authorized charter schools but had no funding provision at all. The Fiscal Note "assumed" that existing State and local funds at the $7,700 level per pupil would be used. Senate Bill 604 passed the Senate but was amended in the House to conform with House Bill 29, which passed the House. The House refused to appoint members to a Conference Committee, however, and so the bills were not enacted.

The stand-off between the Senate and House of Delegates continued in 2002. Senate Bill 213 was a repetition of Senate Bill 604 from 2001. It provided for charter schools but had no funding provision. It passed the Senate but was rewritten in the House of Delegates to conform with the House's consistently held view that the charter schools should receive only the per pupil basic current expense calculated under ED § 5-202. The Senate refused to concur in the House amendments, the House refused to recede from those amendments, and a Conference Committee was unable to resolve the differences. As a result, the bill died.

The impasse was finally broken in 2003. In part, that may have been influenced by the major change that the legislature made in 2002 with respect to the level of, and method of determining, general State funding of public education. *See* 2002 Md. Laws, ch. 288. The 2002 law promised a significant increase in State funding for public education programs. Among other things, it repealed the concept and definition of "basic current expenses" in § 5-202, to which the House of Delegates had pegged its charter school funding formula, and substituted the concept of the "annual per pupil foundation amount."

Senate Bill 75, as introduced, followed the model of Senate Bill 213 in 2002 (and Senate Bill 604 in 2001) and contained no funding provision. As before, the Department of Legislative Services, in its Fiscal Note, assumed that "existing State and local funds would be used to operate the schools" and estimat-

ed the total per pupil expenditures for public schools in FY 2004 to be $9,500.

The Senate Education Committee considered an amendment to provide that "a county board shall disburse the *commensurate rate* of county, State, and Federal money for elementary, middle, and secondary students to a public charter school as is disbursed to other public schools in the local jurisdiction." (Emphasis added). It apparently rewrote that amendment, however, for the Committee amendment actually added was in the form ultimately adopted—that the county board "shall disburse to a public charter school *an amount* of county, State, and Federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdictions." (Emphasis added).

In assessing that language, a Revised Fiscal Note observed that "[a]verage pupil expenditures in fiscal 2004 are estimated at $8,800, ranging from $7,300 in low spending districts to $10,500 in high spending districts. These estimates exclude teachers' retirement payments, capital outlays, and debt service."

As it had done in the past, the House Ways and Means Committee rewrote the bill, and the House of Delegates passed it as so amended, thus setting up another Conference Committee. This time, the Conference Committee rejected the House amendments, both Houses concurred in the Conference Committee Report, and the bill was enacted and signed by the Governor essentially as the Senate had passed it.

We learn several things from this history. One is that for six years the Legislature struggled with trying to fashion a formula for public funding. It considered several alternatives, some tying the funding to the basic current expense model, some using an equivalence to expenditures for "the same kind of student" in other public schools, one pegging the funding at between 90% and 100% of such expenditures, and yet another requiring disbursement of a commensurate *rate*. In the end, the compromise was not a specific formula or actual equiva-

lence but an amount "commensurate" with the amount disbursed to other public schools. That necessarily left some room for interpretation—what was commensurate and how was the amount disbursed to other public schools to be determined when no amounts were actually disbursed to public schools?

■ We presume that, when the Legislature enacted such a law as the lynchpin of a new and untested public education endeavor that was six years in the making, it must have envisioned that SBE—the body it has consistently vested with the ultimate administrative authority to interpret, explain, and apply the public education laws—would have the primary authority to interpret, and the ultimate authority to implement, that provision. There is nothing in the legislative record to suggest an intent to vest such ultimate authority in the local school boards, which, as noted, could lead not only to disparate methodologies for implementing a uniform State law but allow the very entities that had consistently opposed the legislative effort to throttle it through their administratively unreviewable funding policies.

■ The second thing that emerges rather clearly from the legislative history—both the various drafts and the Fiscal Notes prepared by the Department of Legislative Services—is that the determination of commensurate funding would necessarily be on a per pupil basis. In Exhibit 2 to the SBE opinions, the Board explained that there was no Statewide methodology for how county boards fund their schools, that various methods were used nationally with respect to charter school funding, and that, in choosing average per pupil funding, the Board was following the approach of the legislatively-created Commission on Education, Finance, Equity, and Excellence (the Thornton Commission, named for its chairman, Alvin Thornton), later adopted by the General Assembly in the Bridge to Excellence in Public Schools Act (2002 Md. Laws, ch. 288). The Board concluded that the average per pupil approach had the virtues of both simplicity and flexibility and that there was as yet no enrollment history at the three

charter schools "upon which to base a more refined enrollment-driven allocation of funds." Once such a history develops, the Board added, that issue could be revisited. We find no legal error in the Board's use of the average per pupil funding approach.

■ As part of their general attack on the SBE methodology, the city and county boards complain about the requirement that the funding be disbursed in cash, rather than in services, inclusion of Title I and special education expenses, and the limitation of the deduction for administration expenses to 2% in the calculation of commensurate funding. We find no error in any of these respects.

The final version of ED § 9–109(a) requires the disbursement of "an amount of county, State, and federal *money*." (Emphasis added). SBE was not in error in construing that to mean what it says—disbursement of *money*. The SBE rulings allow the charter schools to negotiate for the provision of services, if they would rather have the services, for which they would be required to reimburse the county boards. Services are not prohibited; they just cannot be forced on the charter schools at the whim of the county boards.

■ Because ED § 9–109(a) requires the county boards to disburse "an amount of county, State, and federal money for elementary, middle, and secondary students" that is commensurate with the amounts disbursed to the other public schools, SBE, in the exercise of its statutory authority to explain the true intent and meaning of that requirement, was clearly entitled to conclude that such funding must include Title I and special education funds, to the extent that students in the charter schools are eligible for those services.

■ With respect to the 2% deduction for central administration expenses, the Board was simply unwilling to allow the city and county boards to deduct amounts for the entire range of administrative expenses they choose to incur and instead adopted the approach already in place with respect to grant administration, which the Board found to be reasonable. Im-

plicit in that determination was that the charter schools, being somewhat autonomous, would not need and should not be subject to the full range of control exercised by the central administration over the regular public schools, and that they therefore should not be charged with a share of that total expense. We find no legal error in that determination.

For all of these reasons, we believe that the Court of Special Appeals reached the right conclusions and properly reversed the decisions of the two circuit courts.

JUDGMENTS OF COURT OF SPECIAL APPEALS IN NOS. 100 AND 121 AFFIRMED, WITH COSTS.

BELL, C.J. and RAKER, J. dissent.

RAKER, J., dissenting, BELL, C.J., joining.

The majority in this case asserts that the State Board of Education ("SBE") "was well within its discretion to proceed in the manner it did-adjudicating the cases before it and offering 'guidance' to other applicants, rather than proceeding with more formal and binding regulations." Maj. op. at 346, 929 A.2d at 126. I disagree. The declaratory rulings issued by SBE resulted in regulations in effect, if not name. The policies adopted within those rulings are meant to have general and widespread application, and, in my opinion, should have been the subject of formal rulemaking procedures.

Prior to issuing its declaratory rulings in these cases, SBE had never interpreted Md.Code (1978, 2006 Repl.Vol.) § 9–109(a) of the Education Article.[1] See Maj op. at 336, 929 A.2d at 120. In its rulings, which provided neither the legislative components of formal rulemaking, nor the quasi-judicial components of administrative adjudications, SBE created policies interpreting § 9–109(a) that it intended to apply to every school board in the State. In my opinion, these policies should not have been adopted through a declaratory ruling.

---

1. Unless otherwise noted, all subsequent statutory references herein shall be to Md.Code (1978, 2006 Repl.Vol.) § 9–109(a) of the Education Article.

This Court has never addressed when, if, or to what extent agencies may implement policies through declaratory rulings. Our cases addressing situations when agencies must proceed through formal rulemaking, as opposed to adjudication, are, however, instructive on this point.

We have noted that agencies do not possess absolute discretion to establish policy through *ad hoc* adjudication alone. In *CBS v. Comptroller*, 319 Md. 687, 575 A.2d 324 (1990), we addressed the Comptroller of the Treasury's decision to change the method by which it calculated corporate taxes for out-of-state businesses. We held that it was error for the Comptroller to change its methods through adjudication, and required the agency to engage in formal rulemaking procedures. We acknowledged initially "that the administrative process is enhanced when an agency is allowed substantial flexibility to decide between establishing policy by way of rule or by way of adjudication." *Id.* at 687, 694, 575 A.2d 324, 327. We noted that discretion to choose may, however, be abused, explaining as follows:

> "As a number of the cases requiring rulemaking indicate, this mode of procedure adds an aspect of fairness when an agency intends to make a change in existing law or rule. That fairness is produced by prospective operation of a new rule and by the public notice, public hearing, and public comment processes that accompany rulemaking, but that are sometimes absent from administrative adjudication. The advantages of rulemaking in certain circumstances reinforce the view that this procedure may sometimes be required."

*Id.* at 695–96, 575 A.2d at 328 (internal citations omitted). While we refused to adopt an "all-encompassing" rule dictating when rulemaking is required, we concluded that "when a policy of general application, embodied in or represented by a rule, is changed to a different policy of general application, the change must be accomplished by rulemaking." *Id.* at 696, 575 A.2d at 328.

In *Dept. of Health v. Chimes,* 343 Md. 336, 681 A.2d 484 (1996), we addressed the Developmental Disabilities Administration's decision to implement a growth cap to control costs for community-based health care providers. We explained that both the statute underlying the program and its implementing regulations required DDA to limit expenditures. Therefore, the " 'growth cap' merely effectuated these policies, but did not change the law." *Id.* at 346, 681 A.2d at 489. Formal rulemaking was therefore not required. We stated as follows:

"DDA did not formulate new rules of widespread application, change existing law, or apply new standards retroactively to the detriment of an entity that had relied upon the agency's past pronouncements. The 'growth cap' at issue here applied only to a limited number of providers in their capacity as contractors with a state agency pursuant to contracts between the parties subject to termination by either side."

*Id.*

Similarly, in *MD HMO's v. Cost Review,* 356 Md. 581, 741 A.2d 483 (1999), we addressed the Health Services Cost Review Commission's decision to adopt an inflation adjustment system ("IAS") which was applied to particular health facilities on a case-by-case basis. Although we found formal rulemaking procedures unnecessary, we noted that the underlying adjudication did not involve the formulation of new rules, a change in existing law, or the application of standards that had a retroactive effect. *Id.* at 602, 741 A.2d at 494. We explained as follows:

"The IAS is simply a methodology, long in use, to effectuate the law. It reflects policies set forth by the General Assembly. It is a starting point from which the Commission proceeds case-by-case in order to take into account the individualized costs and needs of the particular hospitals."

*Id. See also Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 169, 501 A.2d 1307, 1319 (1986) (finding rulemaking unnecessary because the adjudication was not one "in which

materially modified or new standards were applied retroactively to the detriment of a company that had relied upon the Commission's past pronouncements"); *Consumer Protection v. Consumer Pub.,* 304 Md. 731, 756, 501 A.2d 48, 61 (1985) (finding formal rulemaking unnecessary because the adjudication "did not change existing law or even formulate rules of widespread application").

Alternatively, in *Massey v. Secretary, Dept. of Public Safety and Correctional Services,* 389 Md. 496, 886 A.2d 585 (2005), we found that formal rulemaking procedures were required after addressing the validity of certain directives adopted by the Department of Public Safety and Correctional Services. The appellant was an inmate in the Maryland State prison system who had been subjected to discipline and had lost diminution credits after being found to have violated the challenged directives. Before this Court, the appellant argued that the directives at issue were regulations that should have been subjected to formal rulemaking procedures. We agreed. Judge Wilner, writing for the Court, explained as follows:

> "[The challenged directives] constitute statements that have general application throughout all of the correctional institutions in DOC and apply to all inmates in those institutions; they have future effect; they were adopted by a 'unit' to carry out laws that the unit administers; and they are in the form of rules, standards, statements of interpretation, and statements of policy."

*Id.* at 507–508, 886 A.2d at 592. We noted further that the directives were not exempt from formal rulemaking as regulations concerning only the internal management of the Division of Correction. Because the directives were regulations, and had not been adopted through formal rulemaking procedures, we held them to be invalid. *Id.* at 500, 886 A.2d at 587.

The above cases demonstrate that administrative agencies do not possess unfettered discretion to issue policies through whatever procedure they choose. We have noted repeatedly that an administrative agency's discretion should be limited where it (1) changes existing law, (2) applies new standards

retroactively, or (3) creates rules of widespread application. Further, we have concluded that an agency must engage in formal rulemaking when it changes existing laws or creates new standards that have retroactive effect. *CBS,* 319 Md. at 696, 575 A.2d at 328.

The majority states that formal rulemaking was unnecessary in this case because the "rulings at issue here were specific to three individual cases that happened to involve some common issues relating to the construction of ED § 9–109." Maj. op. at 346, 929 A.2d at 126. I disagree. It is clear that in issuing its declaratory rulings, SBE created *new policies of general and widespread application* where none existed before. SBE should have engaged in formal rulemaking procedures.

As noted, prior to issuing these declaratory rulings, SBE had never interpreted § 9–109(a). With limited input from the parties involved, and none from outside parties with an interest in the interpretation of § 9–109(a), SBE adopted a general formula to determine the appropriate amount of funding to be disbursed to public charter schools, required that each "charter agreement must be completed within 30 calendar days from the date of the decision approving the charter application," and mandated that the "total average per pupil amount shall be adjusted by a 2% reduction as a reasonable cost to the charter school for these required central office functions." These are not rulings "specific to three individual cases." SBE noted as much when it stated as follows: "We have issued this Opinion as guidance and direction not only to the parties in this appeal but also to the other charter school applicants and local school systems in Maryland ..."

Formal rulemaking was necessary to create the policies at issue. A declaratory ruling, which failed to provide even the quasi-judicial protections of an administrative adjudication, was an inappropriate mechanism for the formation of such widespread policies.[2] As the Attorney General noted in an

---

2. The majority states that "declaratory rulings are treated more in the nature of contested case adjudications than the adoption of a regula-

opinion letter to Audie G. Klingler, D.C. President of the State Board of Chiropractic Examiners:

"The history of [Md.Code (1984, 2004 Repl.Vol., 2006 Cum.Supp.) § 10–304 *et seq.* of the State Government Article] suggests that it was not intended as an alternative to rulemaking when the issue before an agency applies generally to all those subject to its regulatory jurisdiction. Rather, the declaratory ruling procedure was meant to enable persons concerned with a more narrowly focused issue to obtain binding advice about their particular situation.

\* \* \*

The declaratory ruling procedure of the APA is not likely to be a satisfactory alternative to rulemaking if the issue before the agency affects all persons subject to the agency's jurisdiction equally; if the issue affects persons not directly subject to the agency's jurisdiction; if the adjudicative facts presented by the petitioner are probably insufficient to allow informed resolution of the issue; and if the legislative

---

tion." Maj. op. at 345, 929 A.2d at 126. The majority is correct to the extent that both administrative adjudications and declaratory rulings focus on grievances particular to the parties involved. Declaratory rulings differ, however, from adjudications in other respects—most importantly, in the process each provides.

Md.Code (1984, 2004 Repl.Vol., 2006 Cum.Supp.) § 10–301 *et seq.* of the State Government Article allows an agency to issue binding declaratory rulings that explain how it would apply a regulation, order, or statute to a particular party's grievance. The Attorney General has explained this procedure as follows:

"Ordinarily, a declaratory ruling is premised upon the petitioner's assertion of the adjudicative facts underlying the petition. SG § 10–305(b) states that 'a declaratory ruling binds the unit and the petitioner on the facts set forth in the petition.' As one commentator observed, 'ordinarily declaratory orders should be issued only where critical facts are clear and cannot be altered by subsequent events.' 1 C. Koch, *Administrative Law and Practice* § 2.40, at 106 (1985)." 76 *Op. Att'y Gen.* 3, 16 (1991).

Where an administrative agency engages in adjudication to resolve a contested case, the proceedings are quasi-judicial and adversarial in nature. *See Weiner v. Maryland Ins.*, 337 Md. 181, 193, 652 A.2d 125, 131 (1995). As opposed to declaratory rulings, which proceed on a given set of facts, adjudicatory hearings involve trial-type procedures and safeguards. *See C.S. v. P.G. County Social Services*, 343 Md. 14, 32–33, 680 A.2d 470, 479 (1996).

facts that are essential to resolving the issue are disputed. Professor Bonfield, a leading scholar of state administrative law, suggests that an agency should decline to issue a declaratory ruling 'where the ruling, though technically binding only on the agency and petitioner, would *necessarily* determine the legal rights of other parties who have not filed such a petition, and who are opposed to the resolution of the issue by declaratory ruling procedures . . . or who are unrepresented in that declaratory ruling procedure.' A. Bonfield, *The Iowa Administrative Procedure Act,* 60 Iowa L.Rev. at 819 (emphasis in original)."

76 *Op. Att'y Gen.* 3, 15–17 (1991).

The APA provides rulemaking procedures to ensure "fairness and mature consideration of rules of general application." 75 *Op. Att'y Gen.* 37, 43 (1990). The Act serves the important function of safeguarding public rights and educating administrative lawmakers. *Id.* The policies enumerated by SBE in its declaratory rulings are the type contemplated in the APA's rulemaking procedures. Accordingly, I would reverse the judgments of the Court of Special Appeals and remand with directions to affirm the judgments of the Circuit Courts for Baltimore City and Prince George's County.

Chief Judge BELL has authorized me to state that he joins in this dissenting opinion.