Sharell FOREMAN, Individually and on behalf of Qu'ran Foreman, Tyonna Burton, Daniel Burton, minors, Damon Palmer, Individually and on behalf of Day–Quan Brown, Diamond Palmer, minors, and Roslyn Hawkins, Individually and on behalf of William Clark, Dashawn Clark, Camree Hawkins, minors

v.

CHESTER–UPLAND SCHOOL DISTRICT, Chester–Upland School District Empowerment Board, C. Marc Woolley, Katherine Schultz, and Juan Baughn, Appellants.

Chester Community Charter School
and Widener Partnership
Charter School, Inc.

v.

Chester–Upland School District, Chester–Upland School District Empowerment Board, C. Marc Woolley, Katherine Schultz, and Juan Baughn, Appellants.

Commonwealth Court of Pennsylvania.

Argued Dec. 12, 2007.

Decided Jan. 18, 2008.

Wendy Beetlestone, Philadelphia, for appellants.

Joseph T. Doyle, Wayne, for appellee, Chester Community Charter School.

BEFORE: LEADBETTER, President Judge, and SMITH–RIBNER, PELLEGRINI, FRIEDMAN and SIMPSON, Judges.

OPINION BY Judge PELLEGRINI.

The Chester–Upland School District (School District) and Chester–Upland School District Empowerment Board of Control (collectively, Empowerment Board), among others,[1] appeals from an order of the Delaware County Court of Common Pleas (trial court) holding that the Empowerment Board did not have the authority under the Education Empowerment Act[2] to enact Enrollment Resolution A–9 (Enrollment Resolution) to place limits on the number of its students that could attend charter schools.

Chester Community Charter School (CCCS) is a public, non-profit corporation which operates two elementary schools and one charter middle school in the City of Chester, Delaware County, Pennsylvania. The School District is a public school district that is managed and operated by the Empowerment Board pursuant to the Education Empowerment Act.[3] On September 1, 1998, the School District issued CCCS a charter pursuant to the Charter School Law.[4] In February 2001, the charter was renewed for five years. In November 2005, CCCS filed an application

---

1. Also appealing were C. Marc Woolley, Katherine Schultz and Juan Baughn.

2. Act of March 10, 1949, P.L. 30, 24 P.S. §§ 17–1701–B—17–1716–B, *added* by the Act of May 10, 2000, P.L. 44.

3. The School District was initially being managed by a Special Board of Control as a result of the School District's financial distress as determined in 1994 by the Secretary of Education. Pursuant to Section 1705–B(h)(1) of the Education Empowerment Act, 24 P.S. § 17–1705–B(h)(1), "A school district under a declaration of distress pursuant to [24 P.S. § 6–692] section 691(a) and certified as an education empowerment district shall be operated by a special board of control established under section 692. A board of control established under this section shall be abolished upon the appointment of a special board of control under section 692." The Department of Education petitioned to have the Empowerment Board substituted for the Special Board of Control which was granted by order of this Court dated April 16, 2007.

4. Act of March 10, 1949, P.L. 30, 24 P.S. §§ 17–1701–A—17–1751–A, *added* by the Act of June 19, 1997, P.L. 225.

for renewal for an additional five years. On February 23, 2006, the School District granted the renewal, but capped the student enrollment. In March 2006, CCCS filed a petition for review with the trial court challenging the cap on enrollment. A stipulated agreement temporarily suspended that proceeding.

On March 8, 2007, the Pennsylvania Department of Education issued a "Declaration Concerning the Reestablishment of Sound Financial Structure in the School District." In doing so, the Secretary of Education certified that the School District had reestablished a "sound financial structure;" however, the School District still remained an empowerment district under the Education Empowerment Act, and the governing of the School District reverted to the Empowerment Board from the Special Board of Control.[5] On April 26, 2007, purportedly acting within its authority under Section 693(1) of the Public School Code of 1949,[6] to cancel or renegotiate any contract to which it was a party, the Empowerment Board approved the Enrollment Resolution placing limits on the number of students that a charter school in the School District could enroll in its school during the 2007–2008 school year to 2,573 students. The Resolution was amended on July 19, 2007, to allow for an additional 150 students due to additional funding provided by the Commonwealth of Pennsylvania.

To challenge the legality of the enrollment resolution, CCCS filed a petition for review with the trial court against the School District and the Empowerment Board arguing that the Empowerment Board's approval of the enrollment resolution was contrary to the Charter School Law. It did not name the Department of Education or Secretary of Education as respondents. It argued that nothing in the Charter School Law authorized the School District to impose a student enrollment cap, and the enrollment resolution rested on the legally flawed premise that a charter was a contract and the Empowerment Board had the power to cancel or renegotiate charters pursuant to Section 693 of the Public School Code of 1949, 24 P.S. § 6–693. CCCS also filed a complaint seeking a permanent injunction and declaratory relief.[7]

Sharell Foreman (Foreman)[8] filed a separate petition for review in the nature of an appeal with the trial court on behalf of current or future charter school students requesting it to void the enrollment resolution and declare it unenforceable. The petition named the School District, the Empowerment Board and its individual members as respondents. It did not, however, name the Department of Education or the Secretary of Education as respondents. In her petition, she also argued that nothing in the Charter School Law authorized a school board to impose a stu-

---

5. *See* nt. 2.

6. Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 6–693(1).

7. The School District and the Empowerment Board filed preliminary objections to CCCS' declaratory judgment action arguing that it failed to include the Department of Education and the Secretary of Education, which were indispensable parties. The trial court denied their preliminary objections.

8. Foreman filed individually and on behalf of minors Qu'ran Foreman, Tyonna Burton and Daniel Burton; parent Diamond Palmer, individually and on behalf of minors Day–Quan Brown and Diamond Palmer; and parent Roslyn Hawkins, individually and on behalf of minors William Clark, Dashawn Clark and Camree Hawkins. The minors are either students who are currently attending CCCS, children who either have applied for admission to CCCS or children who plan to apply for admission to CCCS.

dent enrollment cap, and the legislative intent of the Charter School Law was clearly to provide all students with their choice of educational institutions, including "schools that operate independently from the existing school district structure." Section 1702–A of the Charter School Law, 24 P.S. § 17–1702–A. Notably, Foreman did not file an action for declaratory relief or any other civil action, including a complaint.

Widener Partnership Charter School (Widener) filed a petition to intervene in CCCS' action against the School District and the Empowerment Board which the trial court granted on June 14, 2007. After intervening, Widener filed a separate declaratory judgment action which also did not name the Department of Education or the Secretary of Education as respondents.[9] Widener argued that the enrollment resolution was in direct violation of the Charter School Law because it froze enrollment at charter schools within the School District. The trial court consolidated the petitions brought by CCCS and Widener with that brought by Foreman for purposes of summary judgment so that the issues common to both actions could be resolved.

All three parties challenging the enrollment resolution submitted a joint motion for summary judgment. They alleged that the enrollment resolution violated the Charter School Law because, *inter alia,* that law allowed parents to choose whether to send their children to charter schools, and the Education Empowerment Act did not authorize the Empowerment Board to renegotiate their contract because charters were not contracts subject to cancellation or renegotiation. The Empowerment Board also filed a cross-motion contending that the Education Empowerment Act did, in fact, give it the authority to cap student enrollment in charter schools. Denying the Empowerment Board's cross-motion and Foreman's motion for summary judgment, the trial court granted summary judgment to CCCS and Widener reasoning that the enrollment resolution was not authorized by the Education Empowerment Act because a charter was not a contract and enjoined the Enforcement Board from enforcing it.[10] This appeal by the School District and Empowerment Board as well as a cross-appeal by Foreman followed.[11]

## I.

▇ The Empowerment Board first contends that the trial court lacked subject matter jurisdiction over this case because the Department of Education and Gerald L. Zahorchak, the Secretary of Education,

9. The School District and the Empowerment Board also filed preliminary objections to Widener's declaratory judgment actions. The trial court never issued a ruling on their preliminary objections. The School District and the Empowerment Board filed an answer to Widener's action for declaratory judgment, but then CCCS and Widener withdrew their requests for preliminary injunctions and no decision was ever rendered. CCCS also filed a motion for summary relief which the School District and the Empowerment Board opposed and the trial court denied due to a lack of jurisdiction.

10. The trial court denied Foreman's motion on procedural grounds stating that she only filed a petition for review and "did not file an action for declaratory relief or any other action at law or equity. Summary judgment was only appropriate in civil actions filed at law or equity. Summary judgment motions were not applicable to petition practice." (Trial court's October 19, 2007 opinion at 15.)

11. Our scope of review of the trial court's order denying summary judgment is limited to determining whether the trial court committed an error of law or abused its discretion. *Laich v. Bracey,* 776 A.2d 1022 (Pa. Cmwlth.2001).

were indispensable parties to this litigation. It maintains that relief cannot be granted without their participation because "The Department will face great expense reimbursing the District for increased charter school enrollment. It could also be required to expend extraordinary resources on the District in order to keep the District viable and fulfill the Department's constitutional mandate to provide for the education of the District's students." (Empowerment Board's brief at 23.) Because the Department of Education and the Secretary of Education are indispensable parties and because this court only has jurisdiction over Commonwealth parties, the trial court was without jurisdiction to declare the enrollment resolution null and void.[12]

A Commonwealth agency or official is only an indispensable party to a proceeding if the action "cannot conceivably be concluded with meaningful relief without the sovereign state itself becoming directly involved." *Pennsylvania State Education Association v. Department of Education,* 101 Pa.Cmwlth. 497, 516 A.2d 1308, 1310 (1986). A party is indispensable where his rights are so connected with the claims of the litigants that no decree can be made between them without impairing such rights. *Sotak v. Nitschke,* 303 Pa.Super. 361, 449 A.2d 729 (1982).

While none of the actions of the Secretary or Department of Education are being challenged, the Empowerment Board argues that those Commonwealth parties are indispensable because the Commonwealth may have to provide more financial aid if more students are permitted to attend charter schools. While that may or may not be a collateral consequence of striking any limitation on students attending charter schools, the only issue is whether the Empowerment Board under the Education Empowerment Act has the power to limit enrollment in charter schools. Just because the Commonwealth may or may not be affected, that does not make it an indispensable party to the litigation.

For example, in *Pennsylvania State Education Association (PSEA),* the PSEA filed a petition to have us invalidate and enjoin two school boards from implementing a tuition agreement between them that was designed to deal with the effects of declining enrollment and diminishing revenue. It also sought to enjoin the Department of Education from making any subsidy payments on behalf of students affected by that tuition agreement, arguing that it was not a proper party and we lacked jurisdiction to decide the controversy. Determining that the Department of Education merely gave advice to the schools and did not approve the changes involved in the instant matter, we stated that "we fail to see how such approval implicates the Department so as to involve it in the instant controversy," *Id.,* 516 A.2d at 1311, and held that meaningful relief could be afforded without its direct involvement. *See also Pennsylvania School Boards Association, Inc. v. Commonwealth Association of School Administrators,* 696 A.2d 859 (Pa.Cmwlth.1997).

All that is involved in this case is whether the Empowerment Board has the authority to limit enrollment of students in charter schools. Because we can give meaningful relief—to decide the enrollment resolution's legality without the Sec-

---

12. Section 761(a) of the Judicial Code, 42 Pa.C.S. § 761(a), provides that "[t]he Commonwealth Court shall have original jurisdiction of all civil actions or proceedings: (1) Against the Commonwealth government including any officer thereof, acting in his official capacity...."

retary or the Department's participation— we hold that the trial court properly found that the Department of Education was not an indispensable party to this action.

## II.

Even if the trial court had jurisdiction, the Empowerment Board contends that the trial court erred in finding it did not have the power to enact the enrollment resolution limiting the number of charter school students because a charter is nothing more than a contract. It contends that a charter is a contract because it has the basic elements of a contract: the parties reach a mutual understanding; exchange consideration; and delineate the terms of the bargain with sufficient clarity. *Weavertown Transport Leasing, Inc. v. Moran,* 834 A.2d 1169, 1172 (Pa.Super.2003). Because it is a contract and Chester–Upland is a financially distressed school district, it argues that it has the power under the Education Empowerment Act to "cancel or to renegotiate *any contract* other than teachers' contracts to which the board or the school district is a party, if such cancellation or renegotiation of contract will effect needed economies in the operation of the district's schools." [13]

In support of this argument, the charter is a contract, it points out that the Department of Education considers the charter a contract in its "Basic Education Circulars" stating that a "Charter is an agreement *or contract* between the school district and an incorporated entity, known as a charter school." (Reproduced Record at 51a.) Finally, and most importantly, it relies on Section 1720–A of the Charter School Law,

24 P.S. § 17–1720–A, which provides that the "written charter shall be *legally binding* on both the local board of school directors of a school district and the charter school's board of trustees," and that establishes that a contractual relationship between it and the charter school exists. (Emphasis added.) For all these reasons, the Empowerment Board contends that because a charter is a contract under the Charter School Law between the School District and the local school board, it had the authority to enact the enrollment resolution.

The relationship between a local school district and a charter school is set forth in the Charter School Law. In enacting that law, the General Assembly stated that its intent in authorizing the establishment of charter schools was to "provide opportunities for teachers, parents, pupils and community members to establish and maintain schools that operate independently from the existing school district structure." Section 1702–A of the Charter School Law, 24 P.S. § 17–1702–A. In carrying out that intent, the Charter School Law sets forth a specific procedure that those seeking a charter school and the school directors must follow. First, those seeking a charter school must file an application containing detailed information such as the grade or age levels served by the school, the governance structure, its mission and goal, how students' education progresses and its financial plan. Section 1719–A of the Charter School Law, 24 P.S. § 17–1719–A. Once an application is filed, the school directors are under specific time constraints for the scheduling of public hearings and taking action on the application

---

**13.** The Empowerment Board points out that approximately 40% of its approximately 7,000 students attend charter schools for which it must pay their instructional costs. It contends that the outflow of students to charter schools is negatively affecting its financial condition because the School District's student base is decreasing as students opt for charter schools, and it is necessary to limit that growth if it is to staunch that outflow of funds and thereby achieve financial stability.

and are required to approve or deny the application based on criteria listed in the Educational Empowerment Act. If the school directors deny the application, the applicants may appeal to the State Charter School Appeal Board, which based on its own evaluation of the evidence, can grant the charter over the objections of the school district. Section 1721-A of the Charter School Law, 24 P.S. § 17-1721-A.[14] Once the application for the charter is granted, based on the application, a written charter granting the right to establish a charter school for three to five years is prepared subject to reauthorization by the school directors or the State Charter Appeal Board. 24 P.S. § 17-1720-A. The school district is required to pay for the student residing in its district and if it fails to do so, the Secretary of Education is required to deduct the estimated amount from all state payments owed to the school district. Section 1725-A of the Charter School Law, 24 P.S. § 17-1725-A. The monitoring of charter schools is entrusted to local school directors. They are given the authority to terminate or refuse to renew the charter if there are material violations of conditions, standards or procedures in the written charter, failures meet state standards regarding student performance or curriculum or failure to meet generally accepted standards of fiscal management or audit requirements. Section 1729-A of the Charter School Law, 24 P.S. § 17-1729-A.

■ As can be seen from the statutory scheme laid out above, the relationship between a school district and a charter school is not contractual, but regulatory: school directors are obligated to issue a charter if the applicant satisfies the criteria set forth in the Charter School Law; if

school directors deny the application, the State Charter School Appeal Board can reverse that decision, and even that decision can be appealed to us. Once a charter is awarded, the Charter School Law statutorily mandates school district obligations requiring that the school district pay to the charter school the statutorily prescribed amount. While Section 1720-A of the Charter School Law, 24 P.S. § 17-1720-A, does provide, "This written charter shall be legally binding on both the local board of school directors of a school district and the charter school's board of trustees," that does not make a charter a contract. It is more like the issuance of a regulatory permit where the state or local government must honor the terms of the permit unless breached by the party receiving the permit. Nowhere in the entire Charter School Law is the term "contract" used to describe the relationship between the charter school and the school board, nor are the terms "offer" and "acceptance" used. Rather, the Charter School Law uses the regulatory terms "application" and "grant" to describe the process of granting a charter school application.

■ What a charter grants is not a contract that "outsources" public education, but the establishment of schools to provide students with a public education. As our Supreme Court recently explained in *Zager v. Chester Community Charter School,* —— Pa. ——, 934 A.2d 1227, 1231 (2007):

Article III § 14 of the Pennsylvania Constitution requires the General Assembly to provide public education to serve the needs of the Commonwealth. "The Constitution of Pennsylvania ... not only recognizes that the cause of education is one of the distinct obligations of the state, but makes of it an

---

14. *See e.g. McKeesport Area School District v. Propel Charter School McKeesport,* 888 A.2d 912 (Pa.Cmwlth.2005), where a charter school's application was denied and the school district was ordered to grant application.

indispensable governmental function." *Malone v. Hayden,* 329 Pa. 213, 223, 197 A. 344, 352 (1938). The Charter School Law, 24 P.S. § 17–1701–A et. seq., pursuant to which Chester Community Charter School was created, defines a charter school as "an independent public school established and operated under a charter from the local board of school directors and in which students are enrolled or attend." 24 P.S. § 17–1703–A. The Public School Code, within which the Charter School Law is contained, is intended to "establish a thorough and efficient system of public education, to which every child has a right." *Hazleton Area Sch. Dist. v. Zoning Hearing Bd.,* 566 Pa. 180, 192, 778 A.2d 1205, 1213 (2001). A stated purpose of charter schools is to "provide parents and pupils with expanded choices in the types of educational opportunities that are available within the public school system." 24 P.S. § 17–1702–A(5). See also *Mosaica Academy Charter Sch. v. Com. Dept. of Ed.,* 572 Pa. 191, 206, 813 A.2d 813, 822 (2002) ("... the General Assembly was clear in defining a charter school as a public school ..."); *West Chester Area Sch. Dist. v. Collegium Charter Sch.,* 571 Pa. 503, 507, 812 A.2d 1172, 1174 (2002) ("A charter school is defined under the [Charter School Law] as an independent, nonprofit, public school ..."). Therefore charter schools, as independent public schools created for the purpose of providing the essential governmental service of education in a constitutionally mandated manner ... ██ In the context of the Charter School Law then, a charter is not a con-

tract, but a grant of power for the board of directors of that school to establish a school to provide public education to school-age children. Consequently, the Empowerment Board did not have authority pursuant to Section 693(1) of the Public School Code to limit charter school enrollment.[15]

Accordingly, the order of the trial court is affirmed.

### *ORDER*

AND NOW, this 18th day of January, 2008, the order of the Delaware County Court of Common Pleas, dated September 4, 2007, is affirmed. The School District and the Empowerment Board's expedited applications to reinstate supersedeas are denied.

Judge LEAVITT did not participate in the decision in this case.

DISSENTING OPINION BY Judge SMITH–RIBNER.

I respectfully dissent from the decision of the majority to affirm the September 4, 2007 order of the Delaware County Court of Common Pleas. The trial court determined that the Chester–Upland School District (School District) and Chester–Upland School District Empowerment Board of Control (Empowerment Board) lacked authority under the Education Empowerment Act,[1] 24 P.S. §§ 17–1701–B – 17–1716–B, to impose enrollment caps on the number of students enrolled in charter

---

**15.** Because we have determined that the School District and the Empowerment Board did not have authority to enact the enrollment resolution, we need not address their remaining issues. For the same reasons, we need not address Foreman's appeal.

**1.** Article XVII–B of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* added primarily by Section 8.1 of the Act of May 10, 2000, P.L. 44.

schools being operated in the School District. The trial court granted summary judgment to the charter schools and denied summary judgment to the School District and the Empowerment Board, and it held that the Empowerment Board's Enrollment Resolution approved April 26, 2007 (amended July 19, 2007) violates the Charter School Law,[2] 24 P.S. §§ 17–1701–A – 17–1751–A, and therefore is illegal and unenforceable.

First, I disagree with the majority's conclusion that the trial court had subject matter jurisdiction over this litigation because the Department of Education and the Secretary of Education (hereafter, Department/Secretary/Appellants) were indispensable to the litigation, yet they were not named as parties to the trial court proceedings. Second, on the merits, I disagree with the conclusion that the charter issued to the charter schools is not a contract but instead is more akin to a grant of power that allows the charter school board of directors to establish a school to provide public education. Based on this assumption, the majority holds that the Empowerment Board lacked authority under Section 693(1) of the Public School Code of 1949, added by Section 2 of the Act of December 15, 1959, P.L. 1842, 24 P.S. § 6–693(1), to limit charter school enrollment and so affirms the order of the trial court. The majority cites no statutory or case law authority for its conclusions, nor does it recognize that its holding sanctions the potential for charter school enrollment to reach a level that effectively reduces to zero the number of students attending the public schools operated by the School District, which might result in a forced shutdown of an entire public school system.

## I

The trial court lacked subject matter jurisdiction because the plaintiffs below failed to join the Department and the Secretary as indispensable parties in their declaratory judgment action. In *Delaware County v. J.P. Morgan Chase & Co.*, 827 A.2d 594 (Pa.Cmwlth.2003), the Court explained the criteria to be used for determining when an absent party is indispensable to an action. Courts should decide whether the absent parties have a right or interest related to the claim; if so, what is the nature of the right or interest of the absent parties; whether the right or interest is essential to the merits of the issue before the court; and whether justice can be afforded without violating the due process rights of the absent parties. *Also see Polydyne, Inc. v. City of Philadelphia*, 795 A.2d 495 (Pa.Cmwlth.2002). Moreover, in *Village Charter School v. Chester Upland School District*, 813 A.2d 20, 26 (Pa. Cmwlth.2002), cited by Appellants, the Court observed that "the Commonwealth party may be declared an indispensable party if meaningful relief cannot conceivably be afforded without the Commonwealth party's direct involvement in the action."

On October 16, 2006, former Commonwealth Court President Judge Colins granted a request made by the Department in the case then captioned *Commonwealth, Department of Education v. Chester–Upland School District, Special Board of Control* (Pa.Cmwlth., No. 496 M.D. 2005, filed October 16, 2006), to appoint a Receiver *Pendente Lite* for the School District because of its "shocking conditions" that required direct and immediate action by the Court. Judge Colins named Secretary of Education Gerald L. Zahorchak as Receiver *Pendente Lite* to have full power and authority to "monitor, assess, and re-

---

**2.** Article XVII–A of the Public School Code, added by Section 1 of the Act of June 19, 1997, P.L. 225, and Section 14 of the Act of June 29, 2002, P.L. 524.

port to the Court on the financial condition of the District to ensure that the District's revenues and expenditures are kept in balance during the fiscal year 2006–2007 and all future fiscal years during which this Order or any subsequent Order, Decree, or Judgment entered in this matter and providing for the appointment of a Receiver for the District might be in effect." *Id.* at 48. The Special Board of Control, which was appointed to manage and control the School District after it was declared financially distressed in 1994, appealed to the Pennsylvania Supreme Court.

On March 8, 2007, the Department issued a Declaration regarding the re-establishment of a sound financial structure in the School District, which had the effect of dissolving the Special Board of Control in place at that time and ending its control over the School District. The Department established the Empowerment Board pursuant to the Education Empowerment Act to maintain the administration and fiscal affairs of the School District, and the Empowerment Board replaced the Special Board of Control. Ousted Special Board of Control members appealed their removal to the Supreme Court. On April 16, 2007, Judge Colins entered an order granting a request from the Department to substitute the Empowerment Board for the Special Board of Control as respondents in the appeal. By opinion and order of December 27, 2007 in *Department of Education v. Empowerment Board of Control of Chester–Upland School District,* —— Pa. ——, 938 A.2d 1000 (2007), the Supreme Court affirmed the substitution order along with an April 17, 2007 order approving a settlement between the Department and the Empowerment Board.

The Special Board of Control was no longer a party to any appeals as it had been properly substituted.

In reaching its determination in *Empowerment Board of Control* that the Special Board of Control had been properly substituted, the Supreme Court elaborated on the power and duty of the Department "[t]o administer all of the laws of this Commonwealth with regard to the establishment, maintenance, and conduct of the public schools . . . ." Section 1302(a) of The Administrative Code of 1929,[3] 71 P.S. § 352(a). The Supreme Court found no ambiguity in the legislative intent with regard to the Secretary, stating that under the scheme set forth in Sections 691 and 692 of the Public School Code, added by Section 2 of the Act of December 15, 1959, P.L. 1842, 24 P.S. §§ 6–691 and 6–692, the Legislature clearly gave the Secretary almost sole discretion and control over the financial distress process and that the Secretary retains primary control over this process.

In deferring to the Department's interpretation of the financial distress statutes, the Supreme Court concluded that in view of the fact that the Department administers the Public School Code and the broad discretion granted the Secretary under those statutes, the Department had authority to make the Declaration under Section 692 and to dissolve the Special Board of Control. In his concurring opinion in *Empowerment Board of Control* Justice Baer highlighted the clear legislative intent to grant the Secretary broad discretion to identify and address nonfunctioning school districts as reflected in a statute that "depends so heavily for its effectuation on the Secretary's judgment." *Id.* at 1015.

**3.** Act of April 9, 1929, P.L. 177, *as amended,* added by Section 1 of the Act of May 15, 1945, P.L. 540.

The Supreme Court was explicit when it explained in *Empowerment Board of Control* the powers and duties of the Department and the Secretary. The discussion by the Supreme Court in that case and others compels a conclusion that their presence was indispensable to any final declaration by the trial court as to the validity of the enrollment caps and their impact upon the fiscal and academic condition of the School District. Appellants rightfully assert that no meaningful relief can be granted without participation of the Department and the Secretary in the trial court litigation when any future funding disputes between the charter schools and the School District will involve the Department, which must ensure that the charter schools receive funding,[4] and when the Secretary as Receiver *Pendente Lite* must consider and approve payments to charter schools.

Unfortunately, the majority has concluded that the Department and the Secretary were not indispensable to the trial court litigation, and, because of this conclusion, it has erroneously resolved that the trial court had subject matter jurisdiction. The majority does not adequately explain why the trial court could grant effective relief in view of the facts that the Department is the agency that administers the Public School Code, which was most recently acknowledged by the Supreme Court on December 27, 2007; that the Department issued the Declaration to dissolve the Special Board of Control and established the Education Empowerment Board; that the Secretary acted as Receiver *Pendente Lite* with broad power and authority granted by this Court and broad discretion to take all necessary ac-

tion to protect the integrity of the financial distress process and to identify and address deficiencies in the School District; and most importantly that the Department's interpretation of the controlling financial distress statutes must be accorded deference by this Court, unless that interpretation is clearly erroneous. Consequently, meaningful relief could not be afforded without the presence and participation of the Department and the Secretary, and because they were not named as parties in the action before the trial court it lacked subject matter jurisdiction, and its order should be vacated.

II

(A)

Assuming *arguendo* that the trial court did have jurisdiction to decide the matter before it, I strongly disagree with the majority's decision that a charter issued by the School District is not a contract and therefore that the Empowerment Board lacked authority to impose enrollment caps under Section 693(1) of the Public School Code. In *Weavertown Transp. Leasing, Inc. v. Moran*, 834 A.2d 1169, 1172 (Pa.Super.2003), cited by Appellants, the court held that "[a] contract is formed when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity." Appellants are correct that a charter represents a mutual understanding between the local school board and the charter school, citing Section 1720–A of the Charter School Law, 24 P.S. § 17–1720–A, and that the criteria for

4. Section 1725–A(a)(5) of the Charter School Law, 24 P.S. § 17–1725–A(a)(5), requires that "[i]f a school district fails to make a payment to a charter school as prescribed in this clause, the secretary shall deduct the estimat-

ed amount, as documented by the charter school, from any and all State payments made to the district after receipt of documentation from the charter school."

proving formation of a contract have been met.

Section 693(1) of the Public School Code grants the Empowerment Board authority "[t]o cancel or to renegotiate any contract other than teachers' contracts to which the board or the school district is a party, if such cancellation or renegotiation of contract will effect needed economies in the operation of the district's schools." *See also* Section 1706–B(a) of the Education Empowerment Act, 24 P.S. § 17–1706–B(a).[5] The majority notes the Department's interpretation in its "Basic Education Circulars" that a charter is a contract, and it additionally notes Section 1720–A of the Charter School Law, which provides that the "written charter shall be legally binding on both the local board of school directors of a school district and the charter school's board of trustees." Yet, the majority glosses over relevant statutory provisions and the Department's interpretation and instead cites provisions from the Charter School Law to announce the following:

> [T]he relationship between a school district and a charter school is not contractual, but regulatory. . . . [The written charter] is more like the issuance of a regulatory permit where the state or local government must honor the terms of the permit unless breached by the party receiving the permit. . . . What a charter grants is not a contract that "outsources" public education, but the establishment of schools to provide students with a public education.

Majority opinion at 115.

A rational and logical interpretation, consistent with the Department's position, is that a charter is a contract. While the Department's interpretation is not binding on the Court, the Supreme Court signaled its clear intent in *Empowerment Board of Control* to defer to the Department's interpretation of statutes, particularly where, as here, the Department is empowered to administer the statutes and where they grant broad discretion in the Secretary. The Court must do likewise and defer to the agency's interpretation, especially in view of the fact that numerous other charter school laws or state court decisions interpreting those laws have defined a charter as a contract or specifically as a performance-based contract.[6]

---

5. Section 1706–B(a) of the Education Empowerment Act provides:

    (a) Except for the power to levy taxes, the board of control may exercise all other powers and duties conferred by law on the board of school directors and the powers and duties conferred by law on a special board of control under sections 693, 694 and 695. In addition to the powers set forth in section 1704–B(a), the board of control shall have the power to close a district school.

6. Appellants correctly maintain that the legislative history of the Charter School Law demonstrates that the legislature never intended for charter schools to jeopardize the financial health of school districts throughout the Commonwealth and that the trial court's decision could produce the unintended consequence of unchecked growth in charter school enrollment to the detriment of School District operations. Appellants note that the Education Empowerment Act explicitly addresses the Empowerment Board's authority while the Charter School Law is silent on enrollment caps, and because the statutes relate to the same subject matter they should both be given effect. Appellants also are correct in pointing out that the rules of statutory construction require that specific provisions of the Education Empowerment Act and fiscal distress statutes should prevail over general provisions in the Charter School Law. They cite *Department of Transportation, Bureau of Driver Licensing v. Campbell*, 138 Pa.Cmwlth. 337, 342, 588 A.2d 75, 78 (1991), where the Court held that "where two statutes appear to conflict, effect should be given to both if possible." This rule applies where statutes relate to the same subject and are considered to be *in pari materia*. 1 Pa.C.S. § 1932.

### (B)

The issue of whether a charter is a contract or, as the majority puts it, is akin to a license or part of some regulatory scheme has not been decided directly by the courts of this Commonwealth, but the issue is not new to numerous other jurisdictions where charter schools exist. Various charter school laws specifically refer to the "contract" between a charter school and local school board that allows the school to operate.[7] In enacting its charter

---

**7.** Various other states' statutes or case law define a charter as a contract or performance-based contract, with application procedures and educational outcomes the same as or similar to those provided in the Charter School Law. *See* **(1)** Alaska Stat. §§ 14.03.250 – 14.03.290, setting forth the application procedures and the essential elements for the contract, including, *inter alia,* educational requirements, statement of funding allocation from the local school board and costs assignable to the program budget, location and description of charter school facility, teacher-to-student ratio, number of students to be served, contract term and termination clause providing that contract may be terminated by the local school board if the charter school fails to meet the educational achievement goals or fiscal management standards; **(2)** Ariz.Rev.Stat. Ann. §§ 15-181 – 15-189.03, setting forth the application procedures and providing that a charter school is a public school established by contract with a district governing board, state board of education or state board for charter schools; *see also Shelby School v. Arizona State Board of Education,* 192 Ariz. 156, 962 P.2d 230 (Ct.App.1998) (recognizing that legislature authorized charter schools to provide learning environment that will improve pupil achievement and to provide additional academic choices for parents and students); **(3)** The Arkansas Charter Schools Act of 1999, Ark.Code Ann. §§ 6–23–101 – 6–23–601, defining a "charter" in § 6–23–103(2) as "a performance-based contract for an initial five-year period between the State Board of Education and an approved applicant" that exempts the public charter school from state and local rules, regulations etc. specified in the contract; **(4)** Charter Schools Act of 1998, Ga.Code Ann. §§ 20–2–2060 – 20-2-2071, defines a charter as a performance-based contract between a local board and a charter petitioner and provides that by entering into a charter the "charter petitioner and local board shall be deemed to have agreed to be bound to all the provisions of this article as if such terms were set forth in the charter." § 20–2–2062(1); **(5)** Charter Schools Law, 105 Ill. Comp. Stat. §§ 5/27A–1 – 5/27A–13, provides in 27A–6 that a "certified charter shall constitute a binding contract and agreement between the charter school and a local school board...." 105 Ill. Comp. Stat. 5/27A–6(a); **(6)** Under Md.Code Ann., Educ. §§ 9–101 – 9–110, charter schools are in the nature of semi-autonomous public schools that operate under contract with a state or local school board, and the contract, or charter, defines how the charter school will function, what programs it will offer and how it will account for its activities. *Baltimore City Board of School Commissioners v. City Neighbors Charter School,* 400 Md. 324, 929 A.2d 113 (2007); **(7)** Under Michigan charter schools legislation, Mich. Comp. Laws §§ 380.501 – 380.507, charter schools are referred to as public school academies, and Section 380.501(2)(d) defines a contract as a written instrument executed by an authorizing body conferring rights, franchises, privileges and obligations on a public school academy and confirming the status of a public school academy as a public school in the state of Michigan; *see also Council of Organizations & Others for Educ. About Parochiaid, Inc. v. Governor,* 455 Mich. 557, 566 N.W.2d 208 (1997); **(8)** Miss.Code Ann. §§ 37–28–1 – 37–28–21 defines a charter as an academic or vocational, or both, performance-based contract between the state board of education, the school board of the local school district and a local school that exempts the school from rules, regulations, etc. of the state board of education and the school district; **(9)** The court in *In re Grant of Charter School Application of Englewood on Palisades Charter School,* 320 N.J.Super. 174, 727 A.2d 15 (App.Div.1999), explained that under New Jersey's Charter School Program Act of 1995, N.J. Stat. Ann. 18A:36A–1 – 18A:36A–18, a charter is a type of contractual agreement with the state whereby the charter school is freed from most state regulation in return for its commitment to increased standards of accountability; and **(10)** Under Va.Code Ann. §§ 22.1–212.5 – 22.1–212.16, an approved charter application shall constitute an agree-

school law, the California legislature did not expressly define a charter as a contract or a performance-based contract as have other legislatures, but in *Knapp v. Palisades Charter High School,* 146 Cal. App.4th 708, 714, 53 Cal.Rptr.3d 182, 186 (2007), the court explained that under the Charter Schools Act of 1992, Cal. Educ. Code §§ 47600–47664, "[t]he charter establishing a charter school is a *contract* detailing the school's educational programs, goals, students served, measurable pupil outcomes and measurement methods, and the school's governance structure.... Charters are granted for a specific term, typically not in excess of five years. At the end of the term, the entity granting the charter may renew the school's *contract.*" (Emphasis added.) (Citation omitted.)

California's Charter Schools Act of 1992 was enacted for the identical purposes and with identical language used in the Charter School Law. In enacting the California law, the legislature intended "*to provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently from the existing school district structure, as a method to accomplish all of the following: (a) Improve pupil learning. ...*" Cal. Educ.Code § 47601. In enacting the Charter School Law, Pennsylvania's legislature intended "*to provide opportunities for teachers, parents, pupils and community members to establish and maintain schools that operate independently from the existing school district structure as a method to accomplish all of the following: (1) Improve pupil learning.*" Section 1702–A, 24 P.S. § 17–1702–A (emphasis added). The majority should be guided by the *Knapp* court and other jurisdictions that have dealt with the precise issue before this Court, and it should

also defer to the interpretation of the Department that a charter is a contract.

On this same issue, the majority again offers no support for the theory that a charter is more akin to "the issuance of a regulatory permit where the state or local government must honor the terms of the permit unless breached by the party receiving the permit." Majority opinion at 115. Nowhere in the Charter School Law, the Education Empowerment Act or in any other statute or case law is there support for this theory. A permit generally is issued by a clerk acting pursuant to the lawful powers of a governmental entity, and the issuance of a license or a permit generally is considered to be a ministerial or administrative act. *Breinig v. Allegheny County,* 332 Pa. 474, 2 A.2d 842 (1938). Permits are not considered a contract with the entity that issues them. *Id.* The majority's analogy simply lacks logic, especially when the Charter School Law makes it clear that the issuance of a charter involves a detailed and thorough process that far surpasses the performance of a ministerial or administrative act.

Finally, because the charter clearly is a contract issued by the School District, the Empowerment Board had full authority under Section 693(1) of the Public School Code to impose the enrollment caps that the trial court invalidated. The issue in *Zager v. Chester Community Charter School,* —— Pa. ——, 934 A.2d 1227 (2007), involved the failure of the chief executive officer of a charter school management corporation (Vahan Gureghian) to produce under the Right–to–Know Act, Act of June 21, 1957, P.L. 390, *as amended,* 65 P.S. §§ 66.1–66.9, an independent auditor's report and financial statements and other records related to the Chester Community Charter School, one of the Appellees here.

---

ment, and its terms shall be the terms of a contract between the charter school and the

local school board etc.

In holding that charter schools, as providers of public education, were subject to the Right-to-Know Act and that the requested records were subject to disclosure, the Supreme Court recognized the constitutional mandate under Article III, § 14 of the Pennsylvania Constitution, for the legislature to provide public education to serve the needs of the Commonwealth.

Citing the decision in *Malone v. Hayden*, 329 Pa. 213, 197 A. 344 (1938), the Supreme Court observed in *Zager* that the Pennsylvania Constitution recognizes that the cause of education is a distinct obligation of the state and that it makes that cause an indispensable governmental function. It is now settled that charter schools are distinctly "independent, nonprofit, public schools" created for the purpose of providing an essential governmental service and to provide another educational choice for parents and students. *Zager.* Charter schools were not created by the legislature, however, to supplant, replace or eliminate the public schools operated by school districts throughout this Commonwealth, nor were they created to cause potential for a shutdown or insolvency of an entire public school system due to the amount of taxpayer dollars diverted from the public schools and provided to the charter schools. The majority fails to comprehend this potential threat to the constitutional mandate for the Commonwealth to maintain a system of public education to serve the needs of its school-aged children.

As a result, if the entities authorized to implement and to administer the Public School Code and the financial distress statutes deem it necessary within their broad discretion and judgment to impose enrollment caps on charter schools to protect the financial health of the existing public school system, then, absent an abuse of discretion, this Court must defer to the judgment of those entities. Accordingly, I would vacate the trial court's order invalidating the enrollment caps because the trial court lacked subject matter jurisdiction to decide the issue or alternatively I would reverse the trial court's order because the Empowerment Board acted lawfully in imposing the caps.